KNOLL, J.
| j This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana, pursuant to La. Const, art. V, § 25(C), that Robert E. Burgess, District Judge of the 42nd Judicial District Court, Parish of DeSoto, be publicly censured for violations of the Code of Judicial Conduct. For the following reasons, we adopt the recommendations of the Judiciary Commission, publicly censure Judge Burgess, and order him to pay costs in the amount of $1,738.49.
FACTUAL BACKGROUND
These disciplinary proceedings arise out of a divorce proceeding between Tad Russell VanZile and the niece of Judge Burgess, Jenifer Susanne Colvin VanZile. On November 7, 2007, Jenifer filed a petition for divorce in the 4th Judicial District Court for the Parish of Ouachita. This petition included a request for a temporary restraining order (“TRO”) enjoining Tad from “harming or harassing [Jenifer] in any way and from going to [Jenifer’s] place of abode for the purpose of harming or harassing [her].” The TRO was granted on November 20, 2007, and the matter was set for hearing on May 22, 2008, before Judge Alvin Sharp.
On January 20, 2008, Judge Burgess went to Monroe to visit his sister Eva, 12Jenifer’s mother. During his visit, Jenifer arrived at Eva’s house in apparent distress and said Tad had come to her house uninvited to take the children for visitation. Jenifer refused, as she believed it was not his day to have the children. Their argument escalated to pushing and shoving. Jenifer said Tad’s rough treatment left her with a bruise on her neck and “claw marks” on her daughter’s arm. Judge Burgess advised Jenifer to speak with her attorney, Robert Tew.
Instead, on January 23, 2008, Jenifer filed a pro se petition for a protective order and a criminal complaint against Tad. The petition for a protective order was not filed as part of the divorce proceeding, and Jenifer marked the section of the form reading “A suit for divorce between the parties is not pending.” As a result, it was assigned a new docket number and randomly assigned to Judge Wilson Rambo. Judge Rambo immediately signed the petition for a protective order and set the matter for a hearing on January 31, 2008. Before the hearing could be held, on January 28, 2008, Judge Rambo vacated the January 23, 2008 protective order because it had not been properly filed as part of the ongoing divorce proceedings. Judge Rambo’s order expressly stated: “any subsequent application for protective order by either party herein shall be presented to the Honorable Alvin R. Sharp for consideration and action.”
The criminal complaint created an apparent conflict of interest with Jenifer’s attorney, Robert Tew, who was a Ouachita Parish Assistant District Attorney. On January 25, 2008, he filed a motion to be relieved as counsel, meaning Jenifer was effectively not being represented by an attorney.
Some time in February 2008, Judge Burgess called Geary Aycock, his longtime friend and a Ouachita Parish Assistant District Attorney, for advice about obtaining a protective order against Tad. Aycock told Judge Burgess the procedure for obtaining a protective order in Ouachi-ta Parish. On February 29, 2008, Judge IsBurgess, Jenifer, and Jenifer’s parents went to the Ouachita Parish District Attorney’s office. There they spoke with the Assistant District Attorney handling the pending criminal charges against Tad. The *607 Assistant District Attorney explained how the case was being handled by the District Attorney’s office and told Jenifer where to go to file a petition for a protective order. Jenifer then left to go on a private interview with a staff member while Judge Burgess visited with Aycock. Jenifer filled out and submitted another petition for domestic abuse protection based on the January 20, 2008 incident.
However, Judge Sharp was not available to sign the protective order. Jenifer and her family were upset by this further delay, and Judge Burgess took it upon himself to find a duty judge to try to “find out what was next.” He went upstairs into the lobby of the judges’ office, where he saw Judge Hamilton Stephens Winters, a judge of the 4th Judicial District Court. Judge Burgess recognized Judge Winters from a judicial conference they had attended together, although Judge Winters did not immediately recognize Judge Burgess.
Judge Burgess said his niece wished to file a petition for a protective order in a domestic case, but Judge Sharp was not available to sign it. Judge Burgess asked Judge Winters what he could do to get the matter on the docket as quickly as possible. Because Judge Winters had an exclusively criminal docket at the time, he called Judge Sharp’s office for advice on how to proceed. There was no answer, and he left a message. Judge Sharp’s secretary soon called back and said Judge Sharp was in Tulsa, Oklahoma, and would not be returning for a few days. She told Judge Winters to review the request for a protective order on Judge Sharp’s behalf and, if necessary, set the matter for hearing.
Judge Winters called the District Attorney’s office and asked them to bring the petition for a protective order back to his office. Judge Winters read the petition |4and signed the order while Judge Burgess was still in the office. A hearing on the rule to show cause was set for March 6, 2008, and Judge Burgess volunteered information about Tad’s schedule so he could be served as quickly as possible. Judge Burgess then left Judge Winters’s office and went to the clerk of court, where he asked for copies of the protective order for Jenifer to distribute at the children’s schools.
On March 6, 2008, Judge Sharp dismissed Jenifer’s petition for a protective order, noting it was filed in violation of Judge Rambo’s previous order. Later the same day, Judge Burgess called Judge Winters and told him the protective order had been vacated, and certain parties claimed Judge Burgess’s discussion with Judge Winters regarding the order was “inappropriate.”
PROCEDURAL HISTORY
In April 2008, Tad filed a complaint against Judge Burgess alleging he had “personally assisted” Jenifer in filing the petition for a protective order and “then ‘walked’ the protective order over to the Fourth Judicial District Court.” Tad asserted he had “incurred significant attorney’s fees, costs and embarrassment” as a result of his wife’s actions “and the actions of those individuals who have helped her.”
The Office of Special Counsel forwarded Tad’s complaint to Judge Burgess. Judge Burgess was invited to respond to any allegations raised in the complaint and was specifically asked to answer the following questions:
1. Whether you assisted your niece, Jennifer [sic] Susanne Colvin VanZile, by contacting and convincing Judge Stephen H. Winters [sic] to sign a protective order in favor -of Ms. VanZile and against Tad Russell VanZile?
*608 2. Whether you assisted your niece, Jennifer [sic] Susanne Colvin VanZile, by contacting and discussing with an employee of the Ouachita Parish | ¡¿District Attorney’s Office a protective order in favor of Ms. VanZile and against Tad Russell VanZile?
Judge Burgess responded by letter:
1. No, I did not assist my niece, Jennifer [sic] Susanne Colvin VanZile, by contacting and convincing Judge Stephen H. Winters [sic] to sign a protective order in favor of Ms. VanZile and against Tad Russell VanZile.
2. No, I did not assist my niece, Jennifer [sic] Susanne Colvin VanZile, by contacting and discussing with an employee of the Ouachita Parish District Attorney’s Office a protective order in favor of Ms. VanZile and against Tad Russell VanZile.
If I can assist you further, please do not hesitate to contact me.
The Judiciary Commission authorized an investigation against Judge Burgess. On October 13, 2008, he submitted a second, more detailed response to the complaint. He admitted his first response, while “technically accurate,” did not “provide a complete picture of the situation.” The second response recounted the relevant events in greater detail and admitted to contacting Geary Aycock for advice and speaking with Judge Winters about the protective order.
Formal charges against Judge Burgess were filed on December 30, 2010, alleging violations of the Code of Judicial Conduct, Canons 1, 2 A, and 2 B,[1] and |fiLa. Const, art. V, § 25(C). The parties entered into a stipulation of facts and of violations of the Code of Judicial Conduct and the Louisiana Constitution as charged. Judge Burgess appeared and testified before Judiciary Commission members on August 19, 2011, and the Judiciary Commission agreed to dispense with a formal hearing and to accept the stipulated facts and law. On October 7, 2011, the Judiciary Commis *609 sion formally recommended Judge Burgess be publicly censured.
DISCUSSION
This Court is vested with exclusive original jurisdiction in judicial disciplinary proceedings under La. Const, art. V, § 25(C), which states:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
|7The Code of Judicial Conduct, adopted by this Court under its supervisory authority, supplements the Constitution’s substantive grounds for disciplinary action against a judge. In re Justice of the Peace Cook, 05-783 (La.6/29/05), 906 So.2d 420, 424. Any violation of the Canons set forth in the Code of Judicial Conduct may serve as grounds for discipline. In re Cresap, 06-1242 (La.10/17/06), 940 So.2d 624, 638. Because Judge Burgess has stipulated to violations of Canons 1, 2A, and 2B of the Code of Judicial Conduct and to Article V, § 25(C) of the Louisiana Constitution, the only question for this Court is the appropriate sanction. In re Shea, 02-0643 (La.4/26/02), 815 So.2d 813, 816.
SANCTION
In re Chaisson, 549 So.2d 259, 266 (La.1989), citing Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), sets forth a non-exclusive list of factors to consider in imposing discipline on a judge:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct;
(b) the nature, extent and frequency of occurrence of the acts of misconduct;
(c) whether the misconduct occurred in or out of the courtroom;
(d) whether the misconduct occurred in the judge’s official capacity or in his private life;
(e) whether the judge has acknowledged or recognized that the acts occurred;
(f) whether the judge has evidenced an effort to change or modify his conduct;
(g) the length of service on the bench;
(h) whether there have been prior complaints about this judge;
(i) the effect the misconduct has upon the integrity |sof and respect for the judiciary; and
(j) the extent to which the judge exploited his position to satisfy his personal desires.
Applying these factors to the facts of this case, we find Judge Burgess acted impermissibly by intervening on behalf of his niece. While his actions were not performed in the courtroom or directly in the course of his official business as a judge, Judge Burgess used the prestige and personal connections gained through his office to assist his niece in obtaining an accelerated disposition of her petition for a protective order. Although Judge Winters testified Judge Burgess’s status as a judge did not influence his decision to sign the protective order, two judges meeting behind closed doors to discuss a case involving one of the judge’s relatives creates an obvious appearance of impropriety.
Judge Burgess went into the chambers of a fellow judge, introduced himself as a judge, and asked for help in finding the *610 “most expeditious means” of getting his niece’s petition before the court. Although Judge Burgess claims he was not acting in his judicial function, but merely as an uncle, we do not believe a judge can “step out” of his judicial function so easily. Both Geary Aycock and Judge Winters knew Judge Burgess was a judge, Aycock because of their long friendship and Judge Winters because Judge Burgess introduced himself as a judge and reminded Judge Winters they had attended a judicial conference together. Judge Burgess later acknowledged a judge is “not just a citizen” but “someone that people react to ... my mere presence has an influence whether it’s intentional or unintentional.” We are also troubled by the ex parte nature of the discussion between Judge Winters and Judge Burgess.
Judge Burgess’s initial refusal to take responsibility for his actions is a further aggravating factor. The initial responses to the Judiciary Commission were | incomplete and misleading, as Judge Burgess did not admit to taking any actions with respect to Jenifer’s case. Judge Burgess emphasizes the conjunctive nature of the first question posed by the Judiciary Commission — whether he “contacted and convinced” Judge Winters to sign the protective order. Judge Burgess admits he contacted Judge Winters regarding the order, but denies he “convinced” Judge Winters to sign it; therefore, he claims his response was technically accurate. This Court expects judges to be as honest and forthright as possible in their dealings with the Office of Special Counsel and the Judiciary Commission. By relying on semantic notions of “technical accuracy,” Judge Burgess was, at the least, less than completely forthcoming.
Judge Burgess’s response to the second question, in which he denied contacting an employee of the Ouachita Parish District Attorney’s office and discussing Jenifer’s protective order, was not even technically accurate. Judge Burgess admits he contacted Geary Aycock, a Ouachita Parish Assistant District Attorney and a longtime friend, who advised him of the proper procedure for obtaining a protective order. However, his initial response to the Judiciary Commission denied contacting any member of the Ouachita Parish District Attorney’s office regarding Jenifer’s case. This was clearly false. Judges are expected to act with the utmost candor in their dealings with the Commission, and Judge Burgess’s misleading and incomplete responses fell well short of this standard.
In mitigation, we recognize Judge Burgess is a seasoned veteran of the bench and this is the first time he has been brought on charges before this Court.[2] 11flThis appears to have been an isolated incident, with no pattern of similar misconduct. He has “come clean” before the Commission, albeit somewhat belatedly, stipulated fault, and has expressed remorse for his actions.
This case is similar to In re Parro, 03-0792 (La.5/2/03), 847 So.2d 1178. Judge Parro, a judge of the First Circuit Court of Appeal, impermissibly intervened on behalf of his niece, who had been charged with felony theft. Judge Parro contacted the District Attorney to discuss the possibility of a pre-trial intervention program. He also asked both the District Attorney and the victim’s father, Judge Parro’s life *611 long friend, whether they would consider dropping the charges in return for full payment of restitution to the victim, and personally contacted the presiding judge to obtain a trial continuance.- Judge Parro claimed he was not acting in his capacity as judge, but as an “uncle and a godparent.” Id. at 1179. We nonetheless found “the prestige of his office was brought to bear on those whom he contacted ... thereby undermining the judicial process,” and Judge Parro was publicly censured and ordered to pay costs. Id. at 1181-82.
Similarly, in In re Lonschein, 50 N.Y.2d 569, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980), a Justice of the Supreme Court of New York[3] was admonished for intervening with the New York City Taxi and Limousine Commission on behalf of a friend who believed the Taxi Commission was giving him “the runaround” on a license application. Justice Lonschein called a deputy counsel for the Taxi Commission, told him about his friend’s predicament, and said “See what you can do for this fellow.” Id. at 571, 430 N.Y.S.2d 571, 408 N.E.2d 901. Although there was no evidence of bad faith or a venal motive, the Court of Appeal nonetheless found he “placed the prestige of his office behind the request” and thus violated the New York Rules Governing | n Judicial Conduct. Id. at 572-73, 430 N.Y.S.2d 571, 408 N.E.2d 901. We find Judge Burgess’s wrongful conduct was substantially similar to the actions of both Judge Parro and Justice Lonschein, and a similar sanction of public censure is appropriate.
The Judiciary Commission also seeks reimbursement of its eosts pursuant to La. S.Ct. Rule XXIII, § 22, which permits this Court to “tax all or any portion of the costs recommended by the commission.” The Office of Special Counsel and Judiciary Commission have included itemized costs statements in the amount of $1,738.49. Judge Burgess does not dispute this figure. We have reviewed the statements, find the requested costs are reasonable, and hereby order Judge Burgess to reimburse the Commission for the full amount of $1,738.49.
DECREE
For the reasons assigned, it is ordered that Judge Robert E. Burgess be publicly censured for violating Canons 1, 2 A, and 2 B of the Code of Judicial Conduct and La. Const, art. V, § 25(C). Judge Burgess is ordered to reimburse the Louisiana Judiciary Commission for costs in the amount of $1,738.49.
VICTORY, Justice, concurs in the result and assigns reasons.
CLARK, Justice, concurs in the result for the reasons assigned by Justice VICTORY.

. The relevant portions of the Code of Judicial Conduct provide:
Canon 1
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
Canon 2
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
As used in this Code, "impartiality” or "impartial” denotes absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge.
B. A judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness. Although a judge should be sensitive to possible abuse of the prestige of office, a judge may, based on the judge’s personal knowledge, serve as a reference or provide a letter of recommendation. Letters of recommendation may be written only on private stationery which does not contain any official designation of the judge's court, but the judge may use his or her title. A judge shall not initiate the communication of information in any court or disciplinary proceeding, but may provide such information for the record in response to a formal request by a court or disciplinary agency official.

. In 2006, an attorney filed a complaint alleging Judge Burgess made an improper ex parte communication in a civil case. The complaint was resolved via a letter of caution from the Judiciary Commission. Although such letters are confidential, they may be referred to in later disciplinary proceedings. In re Cresap, 06-1242 (La.10/17/06), 940 So.2d 624, 632 n. 6 (citing La. S.Ct. Rule XXIII, § 3(d)).

. The Supreme Court of New York is the equivalent of our Judicial District Court.