# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #054

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **11th day of December, 2025** are as follows:

**BY Crain, J.:**

2025-O-00994        IN RE: JUDGE ROYALE COLBERT

SUSPENSION IMPOSED. SEE OPINION.

Weimer, C.J., concurs in the result and assigns reasons.
Hughes, J., dissents and would impose a 90 day suspension.
Griffin, J., dissents and would impose no more than 90 days.
Guidry, J., dissents and assigns reasons.

**CRAIN, J.**

This matter is before the court on the recommendation of the Judiciary Commission of Louisiana. The Commission found Judge Royale Colbert engaged in *ex parte* communications, improperly signed a temporary restraining order without a petition being filed, and was uncooperative and verbally combative with a police officer who stopped him for running a red light. We find violations of Canons 1, 2, 2A, 2B, 3A(1), 3A(3), 3A(4), 3A(6) of the Code of Judicial Conduct and Article V, § 25(C) of the Louisiana Constitution and impose discipline.

## FACTS AND PROCEDURAL HISTORY

This matter involves two separate instances of alleged misconduct by Judge Colbert. Count I arises in connection with the Lafayette Police Department closing an event venue (The District) due to safety concerns before a planned concert. In an *ex parte* communication, Judge Colbert told an attorney for The District that the timing of the closure was "BS," and he would sign a temporary restraining order (TRO) if one were filed. The next day, Saturday, he convened a meeting at the courthouse with attorneys for The District and the City of Lafayette, negotiated safety conditions for the concert, and signed a TRO. This was all done without a petition being filed or assigned to Judge Colbert's division of court.

In Count II, Judge Colbert was stopped by a police officer for running a red light. He was uncooperative and verbally combative with the officer, making threats

to damage the officer's credibility in court. The media reported the TRO incident, prompting the Judiciary Commission to investigate. A judiciary complaint was filed by the Lafayette Police Department regarding the red light incident.

After investigating both incidents, the Judiciary Commission issued a Notice of Hearing to Judge Colbert, alleging violations of Canons 1, 2, 2A, 2B, 3A(1), 3A(3), 3A(4), and 3A(6) of the Code of Judicial Conduct and Article V, § 25(C) of the Louisiana Constitution. Judge Colbert stipulated to facts and conclusions of law and agreed his conduct violated the judicial canons.

The Commission accepted the stipulations, but reserved the right to make additional findings of fact and conclusions of law. Judge Colbert then appeared before the Commission. Based on the stipulations, the pleadings, the exhibits, and Judge Colbert's testimony, the Commission found violations of Canons 1, 2, 2A, 2B, 3A(1), 3A(3), 3A(4), and 3(A)6 of the Code of Judicial Conduct and La. Const. art. V, § 25(C). It further found Judge Colbert's misconduct caused substantial harm to public confidence in and respect for the integrity and impartiality of the judiciary. The Commission recommended a 30 day suspension without pay and anger management treatment.

After the Commission's findings of fact, conclusions of law, and recommendation of discipline were filed with this court, a joint motion to waive oral argument and briefing was filed and granted.

**Count I**

Due to safety concerns, the Lafayette Police Department posted a notice on Friday, August 13, 2021, closing The District, effectively canceling a concert planned there the next day. Soon after the notice was posted, Judge Colbert was called by the attorney for The District who suggested a TRO to prevent the closure. Judge Colbert said it seemed like "BS" that the notice was posted late on a Friday and, if requested, he would sign a TRO.

2

Judge Colbert was then called by the Lafayette City Attorney about the potential TRO. Judge Colbert said he planned to grant a TRO. The attorney explained that the closure was due to a recent shooting and asked for a hearing. Judge Colbert agreed to meet with the parties at the courthouse on Saturday. During the latter call, Judge Colbert used profanity, referring to the closure as "bullsh*t" and "chickensh*t".

Judge Colbert met the parties in his courtroom on Saturday, August 14, 2021. No witnesses were sworn, no court reporter or court staff were present, and no procedural rules were followed. Judge Colbert believed the meeting was to mediate the issue. The city attorney believed the TRO would be signed, so he attended to negotiate additional safety measures for police officers and the public. During this meeting, Judge Colbert again used profanity to describe the closure.

Judge Colbert testified that the pecuniary loss of the deposit paid by The District to a performer was "irreparable damage" justifying a TRO under La. Code of Civ. Proc. art. 3601. He mediated additional safety measures, including the number of police officers needed at the concert, then signed a TRO allowing the concert. No formal pleadings had been filed.

**Count II**

In May 2023, Judge Colbert ran a red light. Officer Dominique Robinson, a Lafayette police officer, witnessed the violation. Officer Robinson was stopped at a red light in the right lane. After the light turned green, Judge Colbert passed him in the left lane. Judge Colbert approached the next traffic light, which was clearly red, and ran it, prompting Officer Robinson to turn on lights and sirens to make a traffic stop.

The ensuing seventeen minute encounter was captured on both dash and body camera videos. Judge Colbert immediately got out of his truck and approached Officer Robinson. Officer Robinson then followed Judge Colbert to retrieve his

3

license and registration. Officer Robinson told Judge Colbert, "a mistake is a mistake, but you kinda came at me a little…", to which Judge Colbert crossly replied that he made no mistake and to "write your ticket." The officer asked Judge Colbert to stand at the front of his truck. He refused. Officer Robinson then radioed for a supervisor and asked "who is Royale Colbert," explaining he ran a red light, "immediately gets out on 10," "flashes a badge," and "refuses to stand in front of the vehicle."

While Officer Robinson processed the ticket, another officer arrived. Judge Colbert asked that officer, who is the supervising lieutenant? He also said if Officer Robinson is "gonna lie, let him lie." Another officer, a supervisor, then arrived and greeted Judge Colbert. Judge Colbert heatedly responded, "he said I ran a stoplight. He's lying. So let him write the ticket … let him lie. I hope it's on camera … just all be prepared to go to court." Officer Robinson approached with the ticket as Judge Colbert said he can "take this mother****er to court." Judge Colbert refused to sign the ticket and said he wanted a copy of the dash camera video.

When asked for his phone number, Judge Colbert gave his "office number." When asked his place of employment, Judge Colbert responded, "Fifteenth Judicial District Court." With the completed citation, Officer Robinson calmly told Judge Colbert: "you work for the court, so I'm assuming you know what to do. I'm not going to waste your time anymore, that's it." Judge Colbert turned to leave and the supervisor began to tell him he could call City Court about the ticket. Judge Colbert turned around, interrupted the supervisor and, in the presence of Officer Robinson and the other officer, said in a raised voice:

> I know the deal. He don't know the deal. I know the deal. He's lying. Let him come to court and tell Judge Saloom I ran one, or Judge Edwards, we'll see how that works…If I'm wrong, I'll apologize. I know f****ing well I didn't run no stop sign. I don't know who the f*** you are? Come on man. You have no idea who you're talking to, do you. Give me a card. I want to know who you are. Give me one of your cards. I want one of his cards…

4

Officer Robinson went to get a card and Judge Colbert said to the supervisor, "I want to get his whole record." The supervisor said Officer Robinson is a "straight-up guy." Judge Colbert again claimed the officer was lying and that if the video showed he ran the red light, he would pay the ticket, but he knew exactly what he did. Judge Colbert then asked the supervisor to pull up the video from the patrol vehicle and either within earshot of or in front of Officer Robinson said:

> Watch it and see. You're the supervisor. So watch it and see. I got all the time in the world. I'm coming from the gym. I was going to wash my truck. Watch it and see. And if I'm wrong, I'll apologize. But if I'm not wrong, if I'm not wrong, I hope he knows what he's in for. Because his credibility is shot…and again, if I'm wrong, I'm going to say I'm wrong, and I'm going to apologize. I just know got damn well I ain't wrong. And if I am wrong, his credibility is shot, and he might as well leave the district.

After starting to get in his truck to leave, Judge Colbert got back out and approached Officer Robinson yelling:

> That bullsh*t trap you're trying to pull about don't walk up on me being aggressive? You need to get rid of that bullsh*t. Because I know you're trained better than that. Cause I taught at the Academy. I know you're trained better than that. That's a trap. You need to do better than that, bro. I'm telling you, you need to do better than that. And this is just me warning you. You need to do better than that. Trying to trap people about how they're resisting arrest, or being belligerent or disturbing the peace? That ain't going to work. You're going to shoot your credibility in the foot. Cause it's already shot.

Judge Colbert then entered his truck and drove away.

## DISCUSSION AND ANALYSIS

The Supreme Court has exclusive original jurisdiction in judicial discipline proceedings. La. Const. art. V, § 25(C). The court has adopted the Code of Judicial Conduct, which supplements the constitutional grounds for disciplining judges. Before discipline can be imposed, charges against a judge must be proven by clear and convincing evidence. *In re Hunter*, 02-1975 (La. 8/19/02), 823 So.2d 325, 328. Applying this standard, we find Judge Colbert committed judicial misconduct.

5

**Count I**

Louisiana Code of Civil Procedure article 3601 provides that "an injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[,]" and "except as otherwise provided by law, an application for injunctive relief shall be by petition." This article further provides that "during the pendency of an action for an injunction the court may issue a temporary restraining order, a preliminary injunction, or both[.]" Louisiana Code of Civil Procedure article 3603 states:

> A. A temporary restraining order shall be granted without notice from the court when all of the following occur:
>
> (1) It clearly appears from specific facts shown by a verified petition, by supporting affidavit, or by affirmation as provided in Article 3603.1(C)(3) that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition.
>
> (2) The applicant's attorney certifies to the court in writing the efforts that have been made to give notice or the reasons supporting the applicant's claim that notice should not be required.
>
> B. The verification or the affidavit may be made by the plaintiff, or by his counsel, or by his agent.

Finally, irreparable damage or injury is a loss sustained by a party which cannot be adequately compensated in money or for which damage cannot be measured by a pecuniary standard. *Terrebonne Parish Police Jury v. Matherne*, 405 So.2d 314, 319 (La. 1981).

Judge Colbert engaged in improper *ex parte* communications with the attorneys involved in closing The District. He prejudged a potential case when he repeatedly told the attorneys how he would rule on a hypothetical TRO. He then signed a TRO without a petition either being filed or assigned to his division. Issuing the TRO without a petition for injunctive relief or supporting affidavit to act on was contrary to express law. His belief that losing a $60,000 deposit was irreparable damage warranting injunctive relief was legally wrong. Although he considered loss

6

of reputation and goodwill to the promotion business as damage, no evidence was presented relative to that. By commenting on a potential legal matter, then taking judicial action without any pleadings being filed, Judge Colbert failed to act as a neutral, detached judge.

The record supports the following judicial canon violations: Canon 1 for failing to personally observe a high standard of conduct so as to preserve the independence and integrity of the judiciary; Canon 2 for failing to avoid the appearance of impropriety; Canon 2A for failing to respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality of the judiciary; Canon 3A(1) for failing to be faithful to the law and maintain professional competence in it; Canon 3A(3) for failing to be patient, dignified, and courteous to litigants, witnesses, lawyers and others with whom he dealt in an official capacity; Canon 3A(4) for failing to perform his judicial duties without bias or prejudice; and Canon 3A(6) for engaging in *ex parte* communications designed to influence his judicial action in a case. By engaging in willful misconduct relating to his official duty, Judge Colbert also violated Louisiana Constitution article V, § 25(C).

**Count II**

The officers at the scene of Judge Colbert's traffic stop were calm and respectful. Judge Colbert acknowledged to the Commission that the video showed, "I was attempting to intimidate the officer. I make no excuses." Without knowing Judge Colbert, Officer Robinson thought he was very aggressive. Officer Robinson testified Judge Colbert flashed a badge at him. Judge Colbert denied "flashing a badge," but acknowledged still carrying his Assistant District Attorney badge in his wallet.

Officer Robinson called his supervisor and asked who is Royale Colbert because: "I was trying to clarify exactly who he was, because it felt like the way he

7

came off was it's somebody I needed to know, but I didn't really quite know who he was, you know. I was relatively new in police work in Lafayette." Officer Robinson instructed Judge Colbert to stand in front of his truck. Judge Colbert refused. According to Officer Robinson, pre-Covid, people who did not sign tickets would typically be brought to jail. However, "because of Covid and also because of who he is, obviously, I wasn't going to put him in cuffs and bring him to jail."

The Commission found Judge Colbert's words and actions were intended to convey a position of power. Officer Robinson believed Judge Colbert asking for his card and "warning" him about the traffic stop was an attempt to intimidate him. Judge Colbert admitted he was trying to intimidate the officer. When asked about the effect of a judge telling another judge he was not credible, Officer Robinson testified:

> Absolutely. Absolutely. I was very nervous about that. That was one thing that I was, you know, upset about. You know, I didn't–obviously on the traffic stop, I didn't express that, but this is my livelihood. This is how I feed my family. If I'm not credible on the stand, what good am I as a police officer?

As of the time of his sworn statement for the Judiciary Commission, Officer Robinson had not sent Judge Colbert any warrant requests, nor would he likely do so.

Judge Colbert's interaction with the police officer was rude, verbally combative and intimidating. He used profanity and called the officer a liar. He refused to obey the officer's instructions. He refused to sign his traffic citation. He said he would tell other judges the officer was a liar. He threatened to discredit him in court. This was all captured on video and convincingly established Judge Colbert abused his authority and position as a judge.

The record supports the following violations relative to the traffic stop: Canon 1 for failing to personally observe a high standard of conduct so as to preserve the independence and integrity of the judiciary; Canon 2 for failing to avoid the

8

appearance of impropriety; Canon 2A for failing to respect and comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary; and Canon 2B for lending the prestige of his judicial office to advance his private interest. Because he engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, as well as willful misconduct relating to his official duty, Judge Colbert also violated Louisiana Constitution article V, § 25(C) .

## Discipline

The violations in both counts require discipline. We are guided by the following: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent, and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires. *In re: Chaisson*, 549 So.2d 259, 266 (La. 1989).

*(a) Is the misconduct an isolated instance or does it evidence a pattern of conduct and (b) what is the nature, extent, and frequency of the acts of misconduct?*

The two counts involved are factually unrelated. However, both reflect a lack of appropriate judicial demeanor. Both involve an abuse of judicial authority, as well as a failure to understand the role of a judge as a neutral arbitrator. Both instances reflect Judge Colbert's failure to act with the dignity expected of a judge, whether in or out of the courtroom. In Count I, he engaged impulsively and without deliberation in having *ex parte* communications, failed to follow express law, abused

9

his judicial authority, and engaged the parties so as to reflect bias and prejudice. In Count II, he raised his voice, used profanity, failed to cooperate with law enforcement, invoked his status as a judge, and made threatening statements to and about a police officer who was professionally performing his job.

*(c) Did the misconduct occur in or out of the courtroom and (d) did the misconduct occur in the judge's official capacity or in his private life?*

In Count I, a Saturday meeting was ordered in Judge Colbert's courtroom. He was contacted by a lawyer and, in his judicial capacity, said it was "B.S." to shut down The District. He called a meeting to negotiate terms and signed a TRO, all without a petition of any kind being filed , much less one verified as required by law.

Although Judge Colbert's actions in Count II occurred outside the courtroom, "the prestige of his office was brought to bear" on Officer Robinson by reminding and threatening him that he had the power to negatively impact his career. *In re Parro*, 03-0792 (La. 5/2/03), 847 So.2d 1178, 1181. A judge cannot "step out" of his judicial function so easily, especially when making references to the power he may wield over a law enforcement officer. *In re Burgess*, 11-2182 (La. 1/24/12), 85 So.3d 604, 610.

*(e) Has the judge acknowledged or recognized that the acts occurred and (f) has he made an effort to change or modify his conduct?*

Judge Colbert stipulated to the facts and ethical violations in the Notice of Hearing. He said multiple times that he takes full responsibility for his actions. He showed remorse by expressing a desire to learn from his mistakes. However, relative to Count I, the Commission was concerned that Judge Colbert believed his misconduct was due to a lack of procedures for handling weekend emergencies. Relative to Count II, the Commission was concerned that Judge Colbert did not recently watch the traffic stop video, leaving him unprepared to discuss his actions in detail before the Commission. The Commission noted Judge Colbert was initially equivocal about whether he ran the red light, but ultimately conceded he did. He

10

eventually accepted responsibility for his inappropriate behavior during the traffic stop.

*(g) How long has the judge served on the bench?*

Judge Colbert took office in January 2021. He was a judge for about seven months when Count I occurred, and over two years when Count II occurred. Before being elected, Judge Colbert was a lawyer for over twenty years. He either knew or should have known not to engage in *ex parte* communications. He either knew or should have known not to commit to ruling a certain way or to demonstrate bias. Legal or judicial experience is not necessary to know that Judge Colbert's treatment of Officer Robinson was inappropriate.

*(h) Have there been prior complaints about this judge?*

In July 2022, Judge Colbert was cautioned for engaging in *ex parte* communications, the same conduct charged in this matter. At that time, a defendant commented that Judge Colbert should recuse himself because he was in a Masonic lodge with the plaintiff's husband. Judge Colbert told the defendant he would recuse himself if he was, in fact, Masonic brothers with the plaintiff's husband. The letter of caution reminded Judge Colbert that *ex parte* conversations are improper and that he should not have addressed the party without a motion to recuse being filed. The repeat violation reflects either a lack of understanding or a resistance to change relative to the boundaries of proper judicial conduct.

*(i) What effect did the misconduct have upon the integrity of and respect for the judiciary?*

Judge Colbert's actions harmed both the integrity of and respect for the judiciary. In Count I, Judge Colbert undermined the impartiality required of a judge. He took a phone call about a developing legal issue. From this *ex parte* communication, he prejudged the situation, committed to signing a TRO, and profanely made his bias clear. Without a petition being filed, he conducted an

11

informal meeting to attempt to broker a deal. The lack of legal formality and procedural safeguards resulted in no record being available to appeal his misguided actions. Media reports about the incident negatively affected the perception of and respect for the judiciary.

In Count II, Judge Colbert disrespectfully and intemperately engaged a police officer performing his lawful duty. Nevertheless, the officer treated Judge Colbert with professionalism and respect. As Officer Robinson testified regarding Judge Colbert's hostile demeanor that day: "I deal with stuff like this all the time. It's just that I don't typically deal with it with a judge." Judge Colbert's abuse of his authority undermined respect for the judiciary.

*(j) To what extent did the judge exploit his position to satisfy his personal desires?*

In Count I, Judge Colbert apparently did not exploit his position to satisfy personal desires. In Count II, Judge Colbert invoked his position of power and influence within the legal system and threatened to ruin Officer Robinson's credibility. This led the officer to treat Judge Colbert differently.

The Commission recommends that Judge Colbert be suspended for thirty days without pay and undergo anger management treatment. We find the recommendation too lenient. The Commission cites case law in support of this recommendation. See *In re Best*, 15-2096 (La. 6/29/16), 195 So.3d 460 (Judge suspended for fifteen days without pay for engaging in *ex parte* communications and adjudicating a matter without the participation of the prosecuting agency); *In re Canaday*, 23-0735 (La. 10/20/23), 372 So.3d 328 (Judge publicly censured for engaging in *ex parte* communications, giving the appearance of committing to rule on a motion to unseal that had not yet been filed, and summarily granting the motion without the required hearing); *In re Cresap*, 06-1242 (La. 10/17/06), 940 So.2d 624 (Judge suspended for thirty days without pay for inappropriate conduct during a hearing on motion to recuse and engaging in *ex parte* communications). While these

cases are helpful with respect to Count I, they do not adequately address the misconduct in Count II.

Case law within Louisiana involving misconduct similar to that in Count II is limited. In *In re: Burgess*, 85 So.3d 604, Judge Burgess contacted an Assistant District Attorney for advice on obtaining a protective order for his niece. He also accompanied his niece to file the petition, and when the judge assigned to her case was unavailable, Judge Burgess sought another judge to expedite the process. Judge Burgess was publicly censured. In *In re: Parro*, 847 So.2d 1178, Judge Parro's niece was charged with felony theft. Judge Parro contacted the District Attorney to discuss the possibility of a pre-trial intervention program. He also asked both the District Attorney and the victim's father whether they would consider dropping the charges in return for full payment of restitution to the victim and personally contacted the presiding judge to obtain a trial continuance. Judge Parro was publicly censured. However, these cases are factually distinguishable in that neither Judge Burgess nor Judge Parro invoked their status as a judge during an encounter with law enforcement in an effort to intimidate.

Other jurisdictions have addressed similar conduct. In *Matter of Ferguson*, 841 S.E.2d 887 (W. Va. 2020), Judge Ferguson caught fish beyond the legal limit. Two undercover officers observed Judge Ferguson's actions. When the officers approached, Judge Ferguson displayed his court identification card in an arrogant manner, implying he was above the law. Judge Ferguson demanded proof of his violation and suggested that the charges would not proceed. His behavior included pacing, raising his voice, and making threatening gestures. He also mentioned the names of supervisors he would contact. Judge Ferguson was issued a citation and later pled no contest to the charge. He was suspended for ninety days without pay.

In *Matter of Williams*, 887 S.E.2d 231 (W. Va. 2023), Judge Williams was stopped for a traffic violation. He identified himself as a judge, questioned the

13

reason for the stop, became visibly agitated, and initially refused to provide his license and registration. He repeatedly told the police officer to "go ahead and give me a ticket" and expressed irritation at being pulled over "for no reason." After the stop, Judge Williams called public officials, including the chief of police and the mayor, and expressed dissatisfaction with the stop, suggesting that the officer should not have his job. He also suggested that he might scrutinize the police department's cases more closely in the future. In judicial discipline proceedings, it was revealed that Judge Williams was involved in other traffic stops where he identified himself as a judge. He was not ticketed on those occasions. Judge Williams was suspended for six months without pay. We find Judge Colbert's conduct analogous to *Williams*.

Here, the Commission recommended a thirty-day suspension without pay. Finding that recommendation too lenient, we impose a six month suspension without pay. *See Williams*, 887 S.E.2d 231. Judge Colbert is further ordered to attend classes for anger management and pay the Judiciary Commission costs of $2,635.96.

## DECREE

Judge Royale Colbert violated Canons 1, 2, 2A, 2B, 3A(1), 3A(3), 3A(4), 3A(6) of the Code of Judicial Conduct and committed willful misconduct in violation of Article V, § 25(C) of the Louisiana Constitution. It is ordered that Judge Colbert be and he is suspended from office without pay for six months. Judge Colbert is further ordered to attend anger management classes and to pay the Judiciary Commission of Louisiana $2,635.96 for costs.

14

# SUPREME COURT OF LOUISIANA

### No. 2025-O-0994

### IN RE: JUDGE ROYALE COLBERT

*Judiciary Commission of Louisiana*

**WEIMER, C.J.**, concurring in the result.[1]

Based on the facts as found by the Judiciary Commission of Louisiana (Commission) and the reasons that follow, I respectfully concur.

Terms have been coined to describe undesirable traits a judge may develop as a result of wearing a judicial robe–such as "Black Robe Fever" or "Robe-itis." Newly elected judges in Louisiana have been warned of this affliction. The symptoms include becoming self-righteous, self-centered, self-serving, pompous, and acting as if the judge is above the law or the law does not apply to a judge, as contrasted to being a servant of the people and a disciple of the law. Manifestations include possessing traits of bias, prejudice, abuse of judicial power, and being overly authoritative, insensitive, and disrespectful. Other traits include a lack of civility, poor temperament, extreme impatience, and overstepping authority by acting outside of the bounds of legal responsibility and engaging in misconduct which undermines public trust. Displays of disrespect, disdain, volatility, and a lack of courage to follow the law as written have no place in judging. Abuse of power involves using the judicial power for personal gain, partisanship, politics, or favoritism, or to intimidate or retaliate against others who do not bend to the judge's will. Such

---

[1] To ensure sufficient votes to impose a sanction, I reluctantly concur in the result. In my view , the sanction imposed is too lenient.

1

behavior fosters distrust of courts and alienation of those who turn to courts for resolution of issues.

Judges who engage in these behaviors lose sight of the fact they were elected to be a public servant assigned to resolve issues properly brought before a judge, to work to improve the system of justice, and to lead by example so as to ensure the rule of law is respected and followed.[2] This type of behavior reflects poorly on our system of justice and other judges, exhibits a lack of respect for the law and ultimately adversely impacts our system of government.

There are countless attributes associated with the making of a "good," "just," "fair," or "honorable" judge. As Founding Father Alexander Hamilton stated metaphorically, the judiciary possesses neither the purse nor the sword. Respect for judicial decisions and the finality provided by judicial decisions can only be assured if there is respect for the judges who toil vigorously each day in the vineyards of justice.

People who cloak themselves in judicial robes are, beneath that garment, people who possess all manner of human frailties. However, the solemn oath taken by a judge demands that each individual comport to certain ideals such as impartiality; independence from politics, partisanship, and personalities; fairness; respect; an understanding of human nature; compassion; level-headedness; even-handedness; discernment; perspicuity; a work ethic that demonstrates being prepared; diligence; and effectiveness and efficiency in resolving issues before the court. Judges must strive to make decisions that are sound, based on the objective

---

[2] Faced with a red light, the respondent ignored the obligation to stop as if the law did not apply to him and then berated a police officer attempting to ensure public safety.

evaluation of facts and evidence, and apply the law as written by the legislature and develop the ability to explain their rulings clearly.

Judges face the profound emotional and mental drudgery of making life-changing decisions that will undoubtedly impact those who appear before them. Their work is compounded by significant caseloads, administrative duties and ceremonial obligations, and, too often, by unfounded criticism. Deciding matters based on what is momentarily popular has no place on the scales of justice. Many decisions judges are called on to make daily, and often multiple times a day, would defy the wisdom of the Biblical Judge Solomon. When Solomon was called on to decide what he desired most of all, he responded "an understanding heart" to discern right from wrong, while referring to himself as a servant. See American Standard Version of the Bible.

The actions of respondent described in the majority opinion, as well as other actions that were omitted therefrom,[3] strike at the very core of our system of justice

---

[3] Respondent stated multiple times that he was so worried and focused on getting home to his daughter that he was not in his right mind and reacted poorly to being pulled over for running a red light. Respondent acknowledged that he never told Officer Dominique Robinson (the officer) he was in a hurry and his daughter was sick, but he stated that was because he was frustrated and not thinking clearly. Yet, respondent told the supervising officer who arrived on the scene that he had "all the time in the world" because he had just left the gym and was going to wash his truck, and he twice turned back to re-engage with and yell at the officers after receiving his ticket instead of simply driving off.

Respondent's words and actions that day belied his insistence that his actions arose out of concern about getting home to his daughter, leaving the Commission to weigh whether he was dishonest in his explanations or whether his anger after getting pulled over was so pervasive that it overrode his legitimate concern for his daughter and caused him to instead waste precious minutes at the traffic stop and facetiously state that he had "all the time in the world" to contest the violation.

Although not readily apparent from the transcript, respondent's demeanor at his appearance before the Commission suggested that he generally has a short fuse and is quick to lose control of his emotions, such that his behavior at the traffic stop was not an isolated incident limited to those circumstances. In fact, another witness testified that respondent has a "hot temper" and recounted when respondent got angry and cursed during a meeting of 10 judges after being aggravated by the planned renovations to the courthouse.

In addition to the actions pointed out in the majority opinion, see **In re: Colbert**, 25-0994 (La. 12/__/25), slip op. pp. 3-5, the Commission observed:

3

and risks the alienation of both litigants and citizens in that they demonstrate failed attempts to justify or explain his behavior and a lack of remorse, which together raise a serious concern about his ability to understand–a trait essential to one who sits in judgment of others.

---

> [The officer]'s dash camera video begins when he is stopped at a red light in the right lane. He accelerates after the light turns green, and [respondent]'s truck can be seen passing him in the left lane. [Respondent] drives down the entirety of a block with the upcoming traffic light clearly red and then runs through that red light, prompting [the officer] to turn on his sirens and lights. When [respondent] pulls over, he immediately gets out of his car—before [the officer]'s car even comes to a complete stop—and approaches him. [References omitted; footnote omitted.]

Notably, respondent did not watch the body and dash camera videos before responding to the Office of Special Counsel's initial inquiry letter or his sworn statement, even though he was provided same  He watched the videos for the first and only time a few days after his sworn statement in March 2024 and did not view them again in preparation for his appearance before the Commission. Respondent stated that he did not need to watch the videos more than once because he realized he was wrong and took responsibility. Despite this insistence that he could "freely admit that day I was wrong," respondent did not unequivocally acknowledge running the red light to the Commission. Instead, when first asked by the Commission, respondent stated that after he got the ticket, a friend of his who was an assistant district attorney and viewed the videos told him that it was "close," but it looked like he ran the light. He then made ambivalent statements to the Commission such as, "[i]f you want to say I ran the red light, I ran the red light."

It was obvious to the Commission upon viewing the officer's dash camera video (in which respondent is seen driving the length of at least an entire block with the upcoming light red before running it) that it was not anything near a "close call." It would have been just as clear to respondent had he viewed the video prior to his appearance, but he did ultimately concede that he ran the red light. Respondent also did not recall other salient details captured on the videos from that day, such as that he asked the officer if he knew who he was taking to and refused to sign the ticket. While the Commission appreciated respondent willingness to admit he was wrong, it noted that he had not prepared to discuss the details of the instant matter.

Respondent acknowledged telling the officer that if he (respondent) was wrong about running the red light, he would apologize, but if the officer was wrong, respondent would ensure that the officer had no credibility in court. As observed by the Commission, respondent was asking the Commission for grace for his missteps but had not been willing to extend the same grace if the officer made a mistake.

Respondent eventually apologized to the officer when he ran into him at a training over ten months after the incident, but he did not reach out earlier because he "thought it was water under the bridge" after speaking to another major with the department. Respondent stated it did not make sense to him that the officer testified (prior to respondent's apology) that he would not want to present a warrant in respondent's courtroom out of fear of reprisal because he had never refused a properly presented warrant, although he conceded how his actions that day could lead the officer to believe there would be bias or repercussion. Even though respondent took an unnecessary dig at the officer during his sworn statement by gratuitously offering that the officer did not have a good reputation in response to the question of whether he had seen the officer since that day, he testified before the Commission that he has no issues with the officer today and that the officer is known as one of the best officers on the force.

His statement to the police officer who stopped him for a clear violation of the law is emblematic of his attitude "[y]ou have no idea who you're talking to" while threatening the officer's career and livelihood. The Commission found his testimony lacked candor and evidenced an unwillingness to admit he was wrong or to apologize. Certainly, one has an absolute right to defend himself in a judicial complaint proceeding. However, the evidence in this matter demonstrates he had no defense. The behavior outlined in this record, unfortunately, demonstrates who the officer was talking to–a person with an attitude unbecoming of one who serves as a judge.[4]

Ultimately, a judge is a public servant assigned the task of resolving issues in which people or entities find themselves embroiled. A judge serves society by resolving these issues respectfully with wisdom and patience, while applying the law as written by the legislature and not straying too far to the left or the right, metaphorically speaking. Serving as a judge is an immensely difficult profession but

---

[4] With respect to Count I, respondent brought the impartiality of the judiciary into question by the actions noted in the majority opinion, see **In re: Colbert**, 25-0994, slip op. at 11-12, which essentially coerced attorneys for the city to attend a meeting wherein he stepped outside of the role of neutral judge and acted as a mediator. Although respondent may have acted with good intentions, his instant indignation upon hearing that the concert organizers were treated in a way he deemed unfair led him to act as an advocate, while exerting his judicial authority, to correct what he alone perceived as wrongs and broker a deal between the parties. Unfortunately, these actions evidence a complete disdain for proper procedure and give the impression that reaching out to a potentially sympathetic judge, even prior to the institution of formal proceedings, may help one side's cause, which encourages forum shopping and perpetuates the unfortunate yet pervasive stereotype of uneven access to justice and fixed outcomes.

Worse still, the lack of formality and procedural safeguards ensured there was no record or means to appeal the misguided actions and ruling. Procedural rules are necessary, not only to avoid the appearance of impropriety or partiality on the part of the judge, or forum shopping on the part of the litigant, but also to promote efficient operation of the court system. **In re: Elloie**, 05-1499, p. 26 (La. 1/19/06), 921 So.2d 882, 900. Moreover, as observed by the majority, once there were media reports about the situation, the public-at-large's perception of the judiciary was negatively affected and its respect for the judiciary was inevitably eroded. See **In re: Colbert**, 25-0994, slip op. at 12.

With respect to Count II, respondent's inability to keep calm or reflect upon his own potential culpability upon being pulled over led him to invoke his authority and threaten and intimidate a law enforcement officer who treated respondent with the utmost professionalism and respect. This led the officer to treat respondent differently based on the status he invoked, as well as to hesitate to bring warrants for respondent to sign out of fear of bias or retribution. Respondent's actions that day clearly undermined the integrity of the judiciary.

5

one that is absolutely essential to a properly functioning society. Although judges are not infallible, final resolution to disputes is indispensable to societal harmony and conflict resolution.

Belligerence, self-centeredness, and a complete disdain for due process (a fundamental legal concept that mandates notice and an opportunity to be heard in an unbiased forum) are all intolerable attributes for one who sits in judgment of others. Respondent's actions (in these matters and in the hearings) seem to teeter on some of those attributes. While I agree that the Commission's recommendation of a 30-day suspension was far too lenient, it is my belief the sanction imposed by the majority is too lenient also. I find respondent's actions warrant a harsher sanction, and he should not serve as a judge until he can demonstrate he possesses the proper temperament and discernment to sit in judgment. I reluctantly concur in the result.

# SUPREME COURT OF LOUISIANA

## No. 2025-O-00994

## IN RE: JUDGE ROYALE COLBERT

### Judiciary Commission of Louisiana

**GUIDRY, J.,** dissents and assigns reasons.

I dissent from the majority's disposition regarding the discipline imposed in this case. At the time of the venue incident, Judge Colbert was newly elected, having served as a judge for approximately seven months. Judge Colbert further stipulated to all of the facts and ethical violations in the Notice of Hearing and asserted multiple times that he took full responsibility for his actions. Considering the *Chaisson* factors and the prior jurisprudence of this court, I would find the Judiciary Commission's recommended penalty appropriate and would accept that recommendation.